**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**LUBBOCK DIVISION**

| | | |
|---|---|---|
| GULF COAST RACING LLC; LRP GROUP LTD.; VALLE DE LOS TESOROS LTD.; GLOBAL GAMING LSP, LLC, AND TEXAS HORSEMEN'S PARTNERSHIP LLP, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No 5:23-cv-00077-H |
| HORSERACING INTEGRITY AND SAFETY AUTHORITY, INC., et al., | § § § § | |
| Defendants. | § | |

---

**PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT AND**
**OPPOSITION TO AUTHORITY'S MOTION TO**
**DISMISS AND FTC'S CROSS-MOTION FOR SUMMARY JUDGMENT**

---

TABLE OF CONTENTS

Table of Authorities ................................................................................. 3

Introduction ............................................................................................ 7

Argument................................................................................................ 8

I.  The Authority is not a self-regulatory organization, but a regulatory agency. ... 12

II.  The Authority is not properly constituted. ............................................. 16

   A.  The Authority's Directors occupy a continuing office established by law. ..... 16

   B.  Only a properly constituted *Authority* can ratify prior Authority actions. ........ 22

   C.  The Authority's Directors are still non-inferior officers. ................................ 25

   D.  Plaintiffs have standing to bring their appointments and removal claims. ..... 27

III.  HISA violates the nondelegation doctrine, including the private nondelegation doctrine because the Authority is not a self-regulatory organization. ................ 28

   A.  If the Authority is private, HISA violates the private nondelegation doctrine. 29

   B.  HISA violates the public nondelegation doctrine. ........................................... 35

IV.  HISA violates Article III, the Seventh Amendment, and the Fourth Amendment of the U.S. Constitution. ........................................................................ 39

   A.  Plaintiffs have standing. .............................................................. 39

   B.  Liberty and property are private, not public, rights. ...................................... 43

   C.  Regulation 8400 violates the Fourth Amendment. ........................................ 46

V.  HISA's commandeering scheme is novel and unconstitutional. ......................... 49

Conclusion ........................................................................................... 52

## TABLE OF AUTHORITIES

Cases

14 F.4th 152, 160-63 (2d Cir. 2021) ........................................................................ 22

15 U.S.C. §§ 3057(c)(1)(A)-(F) ............................................................................... 18

204 F.3d 1125, 1132 (D.C. Cir. 2000) .................................................................... 23

3058(a)-(b) ............................................................................................................. 18

42 F.4th 138, 144 (3d Cir. 2022) ............................................................................ 22

478 U.S. 833, 854 (1986) ....................................................................................... 46

54 F. Supp. 2d 7 (D.D.C. 1999) ........................................................................ 32, 33

561 US 477, 514 (2010) ............................................................................. 19, 28, 41

819 F.3d 1179, 1190-92 (9th Cir. 2016) ................................................................ 22

920 F.3d 1, 10-14 (D.C. Cir.) ............................................................................ 22, 23

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935)......... 9, 34, 35

*Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 873 (11th Cir. 2013) ................................................................................................................. 48

*Am. Horse Prot. Ass'n v. Veneman*, No. 01-00028 (HHK), 2002 WL 34471909, at *5 (D.D.C. July 9, 2002) ............................................................................................ 33

*Aslin v. Fin. Indus. Regul. Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013)....................... 29

*Ass'n of Am. R.R.s. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43 (2015)....................................................................................................... 29

*Brackeen v. Haaland*, 994 F.3d 249, 298–99 (5th Cir. 2021) ............................................ 50

*Braidwood Management Inc. v. Becerra*, No. 4:20-CV-00283-O, 2022 WL 4091215, at *7-*8 (N.D. Tex. Sept. 7, 2022) ............................................................................... 24

*Brennan v. City of Titusville*, 153 U.S. 289, 301 (1894) ............................................... 15

*Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) ................................................. 29

Case 5:21-cv-00071-H, Dkt. 92 at 11-12 ....................................................... 28, 42

*Clark v. Cnty of Placer*, 923 F. Supp. 1278, 1287 & n.16 (E.D. Cal. 1996)................ 28, 41

*Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 797-98 (9th Cir. 2001) ............................................................................................................................. 28, 41

*Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012)..................................... 31

*Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 212 (D.C. Cir. 1998) ..................................................................................................................... 24

*Edmond v. United States*, 520 U.S. 651, 667 (1997) (Souter, J., concurring) ................. 26

*Erenstein v. SEC*, 316 F. App'x 865, 869 (11th Cir. 2008)................................................... 49

*Freytag v. Comm'r*, 501 U.S. 868, 878 (1991) ............................................................. 17

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–55 n.10 (1989) ................................ 45

*id.* at 1998 (Thomas, J., dissenting) ..................................................................... 26

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118 (D.C. Cir. 2015) ..................................................................................................................... 23

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022)................................................................... 45

*Koontz v. St. Johns River Water Management District*, 570 U.S. 595, 607 (2014)......... 42

*Lucia v. SEC*, 138 S. Ct. 2044, 2051-2053 (2018) ........................................... 17, 18, 23

*Lyn v. Inc. Vill. of Hempstead*, 308 F. App'x 461, 464 (2d Cir. 2009)............................... 15

*MA LEG Partners 1 v. City of Dallas*, 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020)......... 42

*Makula v. Vill. of Schiller Park*, 1995 WL 755305, at *6 (N.D. Ill. 1995)........................... 48

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325 & n.23 (1978) ................................................ 33

*Mistretta v. United States*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting) ................. 36

*Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018) ....................... 50

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67, (1982) ................... 43

*National Horsemen's Benevolent & Protective Ass'n v. Black ("NHBPA")*, 53 F. 4th 869 (2022) ........................................................................................................ 9, 30, 31, 32

*New York v. United States*, 505 U.S. 144, 165, 188 (1992) ............................................... 50

*NFIB v. Sebelius*, 567 U.S. 519, 580-81 (2012) ................................................................. 51

*Oklahoma v. U.S.*, 2023 U.S. App. LEXIS 5169 at *21 (March 3, 2023) ........................ 31

*Oklahoma v. United States*, 62 F.4th 221, 234 (6th Cir. 2023) ........................................ 50

*Printz v. United States*, 521 U.S. 898, 935 (1997) ............................................................. 50

*Sokolov v. Vill. of Freeport*, 420 N.E.2d 55, 57 (N.Y. 1981) ............................................ 48

*South Dakota v. Dole*, 483 U.S. 203 (1987) ...................................................................... 51

*Stern v. Marshall*, 564 U.S. 462, 490-91, 493 (2011) ........................................................ 44

*Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) ............................... 32

*Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446-447 (D.C. Cir. 2017) ............. 38

*Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021) ................................................................... 32

*Thompson v. Oakwood*, 307 F. Supp. 3d 761, 775 (S.D. Ohio 2018), modified, No. 3:16-CV-169, 2018 WL 9944970 (S.D. Ohio Apr. 4, 2018) ............................................... 48

*Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977) ................................................. 29

*TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325 (5th Cir. 2017) .................... 42

*Tull v. United States*, 481 U.S. 412, 418 (1987) ............................................................... 46

*United States v. Arthrex*, 141 S. Ct. 1970 (2021) ............................................................. 26

*Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 399 (6th Cir. 2018) ............................... 41

*Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001) ........................... 10, 38

*Whole Woman's Health All. v. Hill*, 937 F.3d 864, 874 (7th Cir. 2019) ............................ 15

*Wiggins Ferry Co. v. City of E. St. Louis*, 107 U.S. 365, 373 (1883) ............................... 15

*Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) ................. 23

Statutes

(h)(1) ..................................................................................................................................... 14

§ 6751(b)(1)-(2) ................................................................................................................... 15

15 U.S.C. § 3052(a) ........................................................................................................ 15, 17

15 U.S.C. § 3052(b)(1) ......................................................................................................... 17

15 U.S.C. § 3053(c)(2) ......................................................................................................... 30

15 U.S.C. § 3053(e) .............................................................................................................. 26

15 U.S.C. § 3054(c)(1)(A)(i) ................................................................................................ 32

15 U.S.C. § 3054(c)(1)(A)(ii) ............................................................................................... 32

15 U.S.C. § 3054(d) .............................................................................................................. 33

15 U.S.C. § 3054(d)(1)-(2) ................................................................................................... 40

15 U.S.C. § 3054(j) .......................................................................................................... 18, 33

15 U.S.C. § 3057(d)(3)(A) ............................................................................................... 19, 43

15 U.S.C. § 3058(c)(3)(C)(ii)(I)(bb) .................................................................................... 21

15 U.S.C. § 6761 ................................................................................................................... 14

15 U.S.C. § 78d-1(b) ............................................................................................................ 21

15 U.S.C. § 78o(b)(1) ........................................................................................................... 33

15 U.S.C. § 78o(b)(4) ........................................................................................................... 33

15 U.S.C. § 78s(a)(3) ................................................................................ 14
15 U.S.C. § 78s(c) ..................................................................................... 29
15 U.S.C. §§ 3054(i) .................................................................................. 44
15 U.S.C. §§ 6751-6761 ............................................................................ 15
15 U.S.C. §§ 78o ....................................................................................... 14
3054(a) ....................................................................................................... 18
3054(c) ................................................................................................. 18, 40
3054(h) ....................................................................................................... 18
3054(j)(1) .................................................................................................... 18
3055(a)(1) ...................................................................................... 17, 18, 26
3056(a)(1) ...................................................................................... 17, 18, 26
3057(a)(1), (c), (d) ..................................................................................... 18
3057(a)-(d) ................................................................................................. 44
5 U.S.C. § 553, 706(2)(a) .......................................................................... 37
6754(c) ....................................................................................................... 16
6759(a)-(b) ................................................................................................. 16
78s .............................................................................................................. 14
Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022) ............................ 30
*id.* § 78o-3(b)(1) ...................................................................................... 14
*id.* § 78s(g)(2) ......................................................................................... 14
Maloney Act, Pub. L. No. 75-719, § 15A(k)(1), 52 Stat. 1070, 1074 (1938) ................... 29

Other Authorities
U.S. Const. art. II § 2, para. 1 .................................................................. 25

Rules
1 William Blackstone, Commentaries on the Laws of England *257-59 (1765) ............... 18
2 Records of the Federal Convention of 1787, at 627 (M. Farrand ed. 1911) ................. 26
8400(a) ....................................................................................................... 40
87 Fed. Reg. 4029 ..................................................................................... 18
87 Fed. Reg. 4029 (Jan. 26, 2022) .......................................................... 42
87 Fed. Reg. at 29864 ............................................................................... 40
FTC Order, Jan. 9, 2023, at 1–2 .............................................................. 31
FTC, March 25 Order ................................................................................. 37
FTC, Press Release (Jan. 9, 2023) .......................................................... 31
https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-approves-
   horseracing-integrity-safety-authoritys-proposed-assessment-methodology-rule ....... 31
https://www.horseracingnation.com/news/Flatter_Critics_of_federal_regulation_should_
   answer_this_call_123 ............................................................................. 13
Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1422 (1989)
   ....................................................................................................................... 47
R. 8400(a)(1) ............................................................................................. 32
R. 8400(a)(2) ............................................................................................. 32
R. 8400(d) .................................................................................................. 32
RESTATEMENT (SECOND) OF AGENCY § 82 (1958) ......................................... 24
Rule 8200(b)(2)(ii), 87 Fed. Reg. 4028 (Jan. 16, 2022) ......................... 37
Rule 8340(a), (c)-(i) .................................................................................. 18

Rule 8340, 87 Fed. Reg. 4029 (Jan. 26, 2022) ...................................................................... 44

Rule 8400 ............................................................................................................................. 18

Rule 8400(a)(1)-(2), 87 Fed. Reg. 44044 ............................................................................. 47

Rules 8340 ............................................................................................................................ 40

## INTRODUCTION

The primary theory on which Defendants rely is that, post-amendment, the Authority is like other self-regulatory organizations that do not exercise government power.[1] Plaintiffs cannot emphasize enough: The Authority is *not* a self-regulatory organization. Not even close. Not one of the other self-regulatory organizations looks or acts anything like the Authority.  Unlike, for example, the National Collegiate Athletic Association (NCAA), or the National Association of Securities Dealers (NASD, now FINRA), the Authority it is not a voluntary association. The Authority does not even have any members. It is just a regulatory *body* that makes rules for *others*. That makes it just a regulatory agency.

The closest the FTC and Authority get to distinguishing the Authority from other governmental agencies is that its work, at the end of the day, *can* be supervised by another agency, namely the FTC. But that distinction makes a difference in only one respect: it means that the Authority may be composed entirely of inferior officers. But inferior officers are still *officers*, and they still exercise government power. If the hallmark for determining whether an individual exercises government power is whether the buck stops with her, then there would be no inferior officers at all. The government would comprise entirely principal officers and any employees or private parties under them. A theory that writes out of the Constitution an entire class of officers and that allows Congress to evade entirely one of its basic structural features established by the Constitution cannot be correct. Yet that is the theory that the FTC and Authority have

---

[1] Unless otherwise defined in this reply brief, capitalized terms and acronyms have the meanings ascribed to them in Plaintiffs' brief in support of summary judgment. DE 36.

offered. It should be rejected.

### ARGUMENT

Because the FTC's and Authority's respective responses to several of Plaintiffs' arguments, including their appointment, removal, and nondelegation claims, rely on the premise that the Authority is a private, self-regulatory organization, Plaintiffs will begin there. Simply put, the Authority is not self-regulatory, and its relationship to the FTC and the horseracing industry is nothing like FINRA's relationship to the SEC and the securities industry. There are several salient differences between the two, including the fact that FINRA is *never once mentioned* in the Maloney Act or any of the relevant statutes; it just happens to have become the leading securities association. In contrast, the Authority is mentioned by name *162 times* in HISA. That is because it is not a self-regulatory organization, but rather a regulatory agency imbued by law with power.

Once that is cleared up, not much remains of Defendants' arguments on Plaintiffs' leading appointments and removal claims. Both Defendants resort to the banal proposition that a properly appointed or removable officer can ratify the acts of a *predecessor* officer who was not properly appointed or removable. But here, the Authority has not been reconstituted by Congress, and its Directors have not been properly appointed. Thus, there is no one to ratify the improperly appointed officers' actions. The same officers are still there and remain improperly appointed. If, as the FTC and Authority seem to argue, *principal* officers like FTC Commissioners can ratify the acts of improperly appointed *inferior* officers, then there'd be no need for any inferior officers at all and an entire class of officers will have been written out of the Constitution. That cannot be right, and Supreme Court and D.C. Circuit precedent says it is not.

Nor did the Fifth Circuit's opinion in *National Horsemen's Benevolent & Protective Ass'n v. Black ("NHBPA")*, 53 F. 4th 869 (2022), hold that the Authority was a private organization. The Fifth Circuit *assumed* that that was the case because that is what the Authority maintains, and the plaintiffs in that case did not challenge that designation, choosing to focus instead on the private nondelegation doctrine. Plaintiffs in *this* case have never conceded that Congress can simply get around what the Constitution requires by designating a government agency to be a private nonprofit. To the contrary, Plaintiffs have always maintained that the Authority exercises government power and is therefore not a private organization. No court anywhere has addressed this claim.

But, if the Authority were a private organization, HISA *still* would violate the private nondelegation doctrine notwithstanding Congress's recent attempt to fix the constitutional infirmity.  That is because the Authority is not a self-regulatory organization, and all of the private nondelegation cases upholding the Maloney Act depend on FINRA being a self-regulatory organization. Here, if the Authority is indeed private, then it is a group of private individuals wielding enormous power over other individuals in their same industry. That fact distinguishes the Authority from FINRA, even though that point was not made in the HISA challenge before Sixth Circuit—which therefore missed this dispositive distinction. It does not matter that the Authority's rules do not go into effect until the FTC promulgates them, just as it did not matter in *Schechter Poultry* that the various industrial codes developed by private industry participants did not take effect unless the President promulgated them. *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 537 (1935). And if the Authority is private, then it still exercises governmental investigatory and adjudicatory powers that no other private organization can.

As for the public nondelegation claim, Defendants here too miss a crucial distinction: that the broad standards *combined with* the absence of notice and comment rulemaking on the *substance* of the Authority's policies is what makes those standards problematic. As for the Authority imposing constraints on itself by noticing its rules and accepting public comments before FTC review, it is established law that an agency cannot cure a nondelegation problem by narrowing the scope of its own authority. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001).[2]

On Plaintiffs' Article III, Seventh Amendment, and Fourth Amendment claims, the Authority makes an argument that the FTC apparently refuses to join: that Plaintiffs do not have standing to pursue them. The FTC refuses to join this argument for good reason: The Authority's registration rule forced Plaintiffs to *consent* to the procedures and processes by which their Article III, Seventh, and Fourth Amendment rights would be violated. If Plaintiffs had refused to consent to having their rights violated, and were thereby denied a license, there would be no question of their standing. But the law does not require them to take such a drastic and risky action. When an agency presents them with unconstitutional conditions, they can consent to the conditions while simultaneously seeking to declare them unlawful. Moreover, here the Authority has threatened enforcement proceedings now that Lone Star Park's racing season has begun. *See* Authority Resp. to Plaintiffs' TRO Application [Dkt. 56] at 17 ("The Authority has long stated that it will enforce HISA only against tracks that export simulcast signals."); *id.* at 19 ("[There was no] reason for Lone Star Park (or anyone) to think Defendants would

---

[2] Upon reviewing Defendants' response and the relevant caselaw, Plaintiffs are no longer pursuing their challenge to the breed-expansion authority under the Act.

ignore their statutory mandate to enforce HISA rules against racetracks that export their signals, *particularly in light of the Authority's clear and consistent statements that it would do so.*").

As for the merits, Plaintiffs demonstrated that several precedents establish that the kinds of adjudications to which Plaintiffs were forced to consent—and which they will encounter if they exercise their right to simulcast—involve matters of private right, while acknowledging the existence of contrary caselaw. Defendants simply rely on that contrary caselaw without explaining why this Court should follow their preferred cases over the ones more consistent with first principles. And on the Fourth Amendment claim, they suggest that the rule has since been amended, apparently not noticing that Plaintiffs cited to the amended rule in their opening brief and noted that the changes were immaterial. They also rely on inapposite cases in which consent moots a constitutional claim when public privileges are at stake, failing to appreciate that this case does not involve welfare benefits.

Finally, anti-commandeering: Defendants opposed Texas's intervention in this case on the ground that "Texas's Interests Are Adequately Represented." DE 24 at 17. Defendants should not be rewarded for making that representation to the Court. Regardless, Plaintiffs are harmed by the provision of HISA in question. And that provision violates the anti-commandeering doctrine because unlike traditional conditional preemption by which the state is given an option to create its own legislative program consistent with federal standards or let the federal government step in, HISA requires the state to *administer* part of the federal program lest its legislative power be preempted. That is a novel arrangement. And it is unconstitutional.

I.      **The Authority is not a self-regulatory organization, but a regulatory agency.**

At the core of Defendants' defense against Plaintiffs' appointments, removal, and private nondelegation claims are that the Authority is a private, self-regulatory organization. The FTC emphasizes that HISA was "[m]odeled on the longstanding, and repeatedly upheld, self-regulatory schemes found in the securities industry," which charges a government agency to rely on a "subordinate 'private, independent, self-regulatory, nonprofit.'" FTC Br. at 1. It asserts that "[t]he relationship between the FTC and the private Authority mirrors the relationship between the" SEC and FINRA, "a private self-regulatory organization that has the power to propose rules and take certain enforcement actions, but whose actions are independently overseen and reviewed by the SEC." *Id.* at 4. Senator McConnell explained that the Authority "was modeled on the relationship between the SEC and FINRA set out in the Maloney Act of 1938." *Id.* at 5. The Authority also emphasizes that it is "similar to self-regulating or accrediting organizations that set and oversee integrity standards in other fields," Authority Br. at 4, and that HISA was "[m]odeled on the Maloney Act, which governs" the SEC's "relationship with self-regulatory organizations like" FINRA, *id.* at 6.

According to the FTC, that disposes of Plaintiffs' Appointments Clause claim, which is a "non-starter" because "[t]he Authority's Directors are unquestionably 'private individuals' and not 'government officials' to whom the Appointments Clause would apply." FTC Br. at 9-10. "Like the financial self-regulatory organizations—such as the New York Stock Exchange and FINRA—on which the Authority's role was modeled, the Authority is not a government creature," and its Directors are not officers. *Id.* at 11. Plaintiffs' removal power claim "fails for the same reason": "Because the Directors are not

officers, Article II imposes no requirement for—or restriction on—their removal." *Id.* at 16. The Authority similarly argues, "Because the Authority is a private entity, rather than a federal governmental entity, its involvement in the regulatory program does not implicate the Appointments Clause or the President's removal power." Authority Br. at 24.[3]

Further, Plaintiffs' private nondelegation claim fails, the FTC argues, because Congress recently amended HISA to give FTC power over the Authority similar to SEC's power over FINRA. FTC Br. at 21-211. The Authority likewise argues that the recent amendment "mirrors the operative language from the provision of the Maloney Act that" other courts have "recognized as the 'key distinction' with the prior version of HISA that made 'all the difference' to the private nondelegation analysis." Authority Br. at 11. "Congress's recent amendment to HISA extinguishes" the private nondelegation claim. *Id.* at 23.

In other words, Defendants rely on the mantra that the Authority is just another run-of-the-mill self-regulatory organization. But this is demonstrably false. Although it appears that congressional leaders sought to model HISA on the Maloney Act, they failed to appreciate key differences between the two. One important distinction was at the center of the Fifth and Sixth Circuit's private nondelegation doctrine holdings: that the SEC could abrogate and modify any FINRA rule, whereas the FTC could not abrogate and modify any Authority rule before Congress's recent amendments. But neither the Fifth nor the

---

[3] Oddly, while the Authority's counsel takes this position, its CEO Lisa Lazarus tells the public something very different: "We still need to figure out where we stand between a public and private entity."
*See* https://www.horseracingnation.com/news/Flatter_Critics_of_federal_regulation_should_answer_this_call_123

Sixth Circuit addressed a different, even more important distinction that Congress's recent amendment does not resolve at all: While FINRA is indeed a self-regulatory organization, the Authority is not.

What makes the NCAA or FINRA self-regulatory organizations is that they are *voluntary associations*. No college athletic program is required to be a member of the NCAA; it could always start its own competing league or association. And no securities dealer is required to be a member of FINRA. They remain free to join any number of other securities associations, or to create new ones.[4] Neither the Maloney Act nor any other relevant statute *even mentions* FINRA by name.[5] The Maloney Act was enacted in 1938; FINRA did not exist until 2007. The Maloney Act merely requires that a securities dealer *be* a member of *an* association of securities dealers. 15 U.S.C. §§ 78o, 78s. That is why the SEC can revoke recognition of any securities association, 15 U.S.C. § 78s(a)(3) & (h)(1), may recognize alternative securities associations, *id.* § 78o-3(b)(1), may relieve an association of its responsibilities as to a particular rule, *id.* § 78s(g)(2), and may "impose limitations upon the activities, functions, and operations of [any] self-regulatory organization," *id.* § 78s(h)(1).

---

[4] Today FINRA, which stands for the Financial Industry Regulatory Authority, calls itself an "authority." But that label does not make it any less a voluntary association. Nor does it matter that FINRA is the only securities association as a result of a merger in 2007. The point is there is a right of exit: securities dealers can always form their own association. HISA does not give anyone in the horseracing industry that option. And that makes all the difference. The right of exit at least gives plausibility to the official story that FINRA is voluntary and self-regulatory.

[5] The only time FINRA is mentioned by statute is in the 2015 law creating the National Association of Registered Agents and Brokers, discussed below. 15 U.S.C. § 6761 ("The Association shall coordinate with the Financial Industry Regulatory Authority in order to ease any administrative burdens that fall on members of the Association that are subject to regulation by the Financial Industry Regulatory Authority.").

---

In contrast, the FTC has none of these powers over the Authority, which is recognized and established *by HISA itself*. 15 U.S.C. § 3052(a). HISA specifically mentions the Authority by name *162 times* and, unlike the Maloney Act, nothing in HISA allows for the creation of *competing* associations of "covered persons" that would self-regulate those members. Thus, the Authority is nothing like either the NCAA or FINRA. It is not an association of members, and even if it were, it would not be a voluntary association. It is just a regulatory *body* that makes rules for *others*, which is to say, just a regulatory agency.

At a minimum, then, the Authority is like any occupational licensing board, which are arms of the government because licensing is a regulatory power. *See, e.g.*, *Whole Woman's Health All. v. Hill*, 937 F.3d 864, 874 (7th Cir. 2019) ("State licensing regimes are ubiquitous. . . . Generally speaking, those regimes fall comfortably within the state's police power."); *Lyn v. Inc. Vill. of Hempstead*, 308 F. App'x 461, 464 (2d Cir. 2009) ("licensing code" falls within a "city's police powers"); *Brennan v. City of Titusville*, 153 U.S. 289, 301 (1894) ("a license may be required in the exercise of the police power"); *Wiggins Ferry Co. v. City of E. St. Louis*, 107 U.S. 365, 373 (1883) ("The power to license is a police power.").

Consider, for example, the National Association of Registered Agents and Brokers, which was empowered by law in 2015 to license and register insurance producers selling their product out-of-state. 15 U.S.C. §§ 6751-6761. The law declares the association to be a private corporation—presumably, like the Public Company Accounting and Oversight Board ("PCAOB"), for purposes of retaining top talent, *id.* § 6751(b)(1)-(2)—but Congress nevertheless recognized the importance of making the entire Board of Directors

appointable (by and with advice and consent of the Senate) and removable by the President. *Id.* §§ 6754(c), 6759(a)-(b). Although not dispositive of the constitutional question, Congress's legislation from 2015 suggests that it understood a licensing board to be exercising government power and that its officers must therefore be appointable and removable by the President.

Moreover, as noted, the Authority has far more power than even the mine run of licensing boards: it has full-fledged authority to make rules and regulations for an entire sector of the national economy. It is, in this regard, no different than any other government agency, like the Environmental Protection Agency, the Social Security Administration, the Federal Communication Commission, or the Department of Transportation. Not a single feature of the Authority distinguishes it from these other governmental bodies.

The conclusion is inescapable: HISA is no different than the "Federal Trade Commission Act" creating the FTC, the "Food, Drug, and Cosmetic Act" creating the FDA, or the "Telecommunications Act" creating the FCC. Simply put, the "Horseracing Integrity and Safety Act" establishes the "Horseracing Integrity and Safety Authority" as a regulatory agency. Defendants' central arguments against Plaintiffs' appointments, removal, and private nondelegation claims must therefore be rejected.

## II.   The Authority is not properly constituted.

Although most of the Defendants' arguments center on their erroneous premise about the self-regulatory nature of the Authority, they lob some additional arguments against Plaintiffs' appointment and removal arguments. Some of these further arguments also depend on that erroneous premise; none is persuasive.

### A.   The Authority's Directors occupy a continuing office established by law.

Plaintiffs discussed the definition of "officer" and executive power at length in their opening brief. To repeat and summarize the undisputed facts: The Directors and their subordinates can compel compliance with subpoenas. They can compel testimony as part of their investigative activities. They can conduct searches and seizures with no judicial authorization. They can conduct hearings to adjudicate violations of their own rules. They can initiate enforcement actions in federal court. And they promulgate legislative rules binding on third parties, which the FTC may but need not modify. *No private individual has such powers*. If a private party exercised these powers to enter a business to search for and seize documents, they would be arrested for burglary, plain and simple.

Under the Supreme Court's precedents, the Directors' wielding of such power makes them government officers. The two criteria "for distinguishing between officers and employees" are that to be an officer the "individual must occupy a 'continuing' position established by law" and must exercise "significant authority pursuant to the laws of the United States," that is, "'significant discretion' when carrying out . . . 'important functions.'" *Lucia v. SEC*, 138 S. Ct. 2044, 2051-2053 (2018) (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)).

Plaintiffs' opening brief established that the Directors occupy a "continuing position established by law." HISA establishes that "[t]he Authority shall be governed by a board of directors." 15 U.S.C. § 3052(b)(1). The Authority itself, as directed by the Board, engages in numerous statutory duties, including "developing and implementing" and "establish[ing]" a horseracing anti-doping and medication control program and a racetrack safety program with punishments for violations. *Id.* §§ 3052(a), 3055(a)(1), 3056(a)(1),

3057(a)(1), (c), (d). The Act recognizes that it is bestowing "powers and responsibilities under this Act" upon the "Authority." *Id.* § 3054(a). It authorizes the Board to make rules for accessing documents, issuing subpoenas, and engaging in investigations. *Id.* § 3054(c). It grants the Directors "subpoena and investigatory authority with respect to civil violations committed under its jurisdiction." *Id.* § 3054(h). It grants the Authority power to "commence a civil action against a covered person or racetrack" that has violated the Act. *Id.* § 3054(j)(1).

Plaintiffs' opening brief also established that the Directors are exercising significant authority under the Supreme Court's precedents. As in *Lucia* and *Freytag*, the Board can "take testimony," "receive evidence," and "examine witnesses at hearings"; it can "conduct trials" (hearings), and specifically "administer oaths, rule on motions, and generally regulate the course of a hearing, as well as the conduct of parties and counsel"; and it can "rule on the admissibility of evidence" and "thus critically shape the administrative record (as they also do when issuing document subpoenas)." *Lucia*, 138 S.Ct. at 2053; *see also* 15 U.S.C. §§ 3057(c)(1)(A)-(F), 3058(a)-(b); Rule 8340(a), (c)-(i), 87 Fed. Reg. 4029. In addition, the Authority has wide search and seizure powers that, to repeat, would be unlawful if conducted by private individuals. Rule 8400. The Authority brings public prosecutions in district court, 15 U.S.C. § 3054(j), which is a core executive power. 1 William Blackstone, Commentaries on the Laws of England *257-59 (1765). And the Authority "shall establish" various legislative rules—the bread and butter of the administrative process—with now optional supervision from the Federal Trade Commission. 15 U.S.C. §§ 3055(a)(1), 3056(a)(1). These duties all involve "significant discretion" over "important functions."

In *Free Enterprise Fund*, for example, the Supreme Court held that the PCAOB exercised "significant executive power," 561 US 477, 514 (2010), despite Congress having declared it a private entity because all firms registered with the Board and had to "comply with its rules and oversight," *id.* at 485—just as all firms must do so here. And just as the PCAOB does, the Authority promulgates standards, performs inspections, demands documents and testimony, initiates formal investigations and disciplinary proceedings, and issues severe sanctions. 15 U.S.C. § 3057(d)(3)(A).

Importantly, neither the FTC nor the Authority disputes that if the Directors are officers, Plaintiffs' removal power and appointments clause claims are valid. Nor does the FTC question any of the cases fleshing out the meaning of "officer," resorting instead to faulty arguments about ratification (addressed below) and the private nature of the Authority. FTC Br. at 12 ("neither *Lucia* nor any of the other authority Plaintiffs cite suggest that the Appointments Clause applies to private entities"). Only the Authority spends any time on these cases, and its response to them is unpersuasive.

The Authority first argues that the Directors' offices are not established by law, but rather by the Authority's own incorporation documents, reiterating that the Authority is a self-regulatory organization. Authority Br. at 29. But as already demonstrated, the Authority is not a self-regulatory organization. And if Defendants were correct that the Authority could escape the Appointments Clause by self-incorporating before relevant legislation is enacted, then every government agency could escape the clause that same way. Congress, in coordination with industry members, could encourage a group of "private" individuals to create the "environmental protection authority" as a nonprofit organization that proposes environmental regulations with which members of the coal

industry must comply. It could collude with "private" individuals to create the "federal communication authority," a private non-profit organization that regulates anyone who wants to transmit over the airwaves. And on and on, as long as those private "authorities" had some supervision by another agency. That cannot be right.

In any event, Plaintiffs observed in their opening brief that even if one could plausibly believe that the Authority was incorporated totally independently of the enabling legislation from Congress imbuing it with authority, what matters is that HISA in fact imbues the Authority with power. If the government empowered the Yale School of the Environment to promulgate environmental regulations binding on private parties and to adjudicate violations, it would not matter one bit that the school had long been established as a department of Yale University. It would *now* be a government agency. The Authority's only response to this point is familiar: "But the Maloney Act, on which HISA was modeled, no less assigns duties to FINRA and other SROs. And those 'private self-regulatory organizations' do not run afoul of Article II." *Id.* at 31. Plaintiffs have already dispatched that argument. The Authority is not a self-regulatory organization, and so Article II applies.[6]

The Authority next argues that the Directors do not enjoy "a career appointment" like the ALJs in *Lucia*, but rather can serve no more than two consecutive three-year terms. *Id.* On that reasoning, officers who are limited to a term of years like U.S. Attorneys

---

[6] The Authority also responds to the fact that HISA imbues the Authority's Directors with power by arguing that the statute's specification of a board is a "condition" on the Authority's exercise of power. Authority Br. at 29. It is not entirely clear what that means, or whether all offices could be reconceptualized as "conditions" on the relevant agencies' exercise of "powers" under their organic statutes—which would be still another end run around the Appointments Clause.

or the FBI Director would not be "officers," a conclusion that demonstrates its absurdity. *Lucia* requires a continuing *office*, not a particular continuing *officer*.

The Authority's remaining argument recycles the erroneous notion that because the Authority's work is reviewed by the FTC, its officials are not officers. *Id.* at 31-33. Plaintiffs wrote in their opening brief that it is irrelevant how much supervisory authority the FTC has over any of the Authority's powers and duties because that relates to whether an officer is principal or inferior, not to whether she is an officer at all. Yet the Authority simply responds that "[a]ny standard proposed by the Board that could have legal effect requires the FTC's approval and promulgation of a final rule," and "any final decision by the Board is subject to two layers of de novo FTC review." *Id.* at 31. Further, unlike in *Lucia*, where the ALJs could "critically shape the administrative record," here the FTC itself can take on new evidence, thereby shaping that record itself. *Id.* at 31-32.

That entirely misses the point. First of all, the FTC *may*—but need not—accept and hear new evidence, and only if "there were reasonable grounds for failure to submit the evidence previously," 15 U.S.C. § 3058(c)(3)(C)(ii)(I)(bb), meaning that more often than not the record and evidence will be determined entirely by the initial adjudication and not by the ALJ or the FTC. More still, even in *Lucia* the SEC always had the power to rehear that matter on its own or to hear the matter in the first instance, 15 U.S.C. § 78d-1(b) (authorizing, but not requiring, the SEC to delegate adjudicatory functions to ALJs), and thereby shape the administrative record by hearing the case or remanding to the ALJ with instructions. The point is that the Authority itself crucially shapes the record, even if other actors above it get to shape that record in some instances, too.

The bottom line is simple: The Authority time and again counters Plaintiffs'

arguments by stating that "the FTC, not the Authority, has the 'final word'" on a variety of issues. Authority Br. at 33. But that only matters for distinguishing principal from inferior officers, not for determining who is an officer to begin with.

**B.      Only a properly constituted *Authority* can ratify prior Authority actions.**

Plaintiffs anticipated Defendants' primary remaining argument. Plaintiffs wrote, "The Authority may try to argue that the proper remedy for this constitutional violation is for the FTC to ratify the *decisions* of the Authority, even if it cannot ratify their *appointments*." Defendants indeed cite cases in which the acts of improperly appointed officials have been ratified. FTC Br. at 13-16; Authority Br. at 33-35. But these cases stand for the proposition that a properly constituted officer can ratify the acts of an improperly appointed *predecessor* to that office, not that a properly appointed principal officer can ratify the acts of an improperly appointed inferior officer.

For example, *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, cited by both the FTC and the Authority, involved ratifying the acts of an acting attorney general by a properly appointed and confirmed attorney general. 920 F.3d 1, 10-14 (D.C. Cir.). In *NLRB v. Newark Electric Corp.*, cited by both Defendants, the Second Circuit held that a properly appointed NLRB General Counsel could ratify the decisions of an improperly appointed, acting NRLB General Counsel. 14 F.4th 152, 160-63 (2d Cir. 2021). *Kajmowicz v. Whitaker*, cited by both Defendants, once again involved ratification of an act taken by an acting attorney general by a properly appointed attorney general. 42 F.4th 138, 144 (3d Cir. 2022). *CFPB v. Gordon*, cited by both Defendants, involved a properly appointed CFPB Director's ratification of acts he had taken before he was properly appointed. 819 F.3d 1179, 1190-92 (9th Cir. 2016). And two other cases quoted by the

FTC specifically describe that a properly constituted board can ratify the acts of an improperly constituted board. *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017); *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 796 F.3d 111, 118 (D.C. Cir. 2015).

That is entirely different from allowing a principal officer to ratify the decisions of an improperly appointed inferior officer. If that were allowed, then Congress would never need to establish inferior officers and Congress could get around the Appointments Clause altogether. It would allow the principal officers to ratify the decisions of all their subordinates. An argument that so easily allows Congress to evade basic constitutional structure and constraints cannot be right.

And precedent forecloses it. In *Landry v. FDIC*, the D.C. Circuit held that *de novo* review by the Federal Deposit Insurance Corporation of ALJ determinations did not cure the Appointments Clause violation because "[i]f the process of final *de novo* review could cleanse the violation of its harmful impact, then all such arrangements would escape judicial review." 204 F.3d 1125, 1132 (D.C. Cir. 2000). This applied to all "purely decision recommending" officers—exactly the kind of officers Defendants claim we have here. *Guedes* confirmed that courts must "resolve[] the merits of an Appointments Clause challenge" to any "purely decision recommending" officers/employees, "notwithstanding the subsequent *de novo* review and affirmance of that decision by the agency itself." 920 F.3d at 13-14.

*Lucia* is also instructive: There the Supreme Court remanded for a new adjudication in front of a properly appointed ALJ. 138 S. Ct. at 2055. If a principal officer could ratify the decisions of an inferior, then when the SEC upheld the ALJ's decision it

would have ratified the ALJ's decision. The Supreme Court, however, did not see it that way, confirming that a properly appointed official can ratify the actions only of an improperly appointed predecessor.

The FTC provides a single, out-of-context quote that appears to stand for the contrary proposition: "'[r]atification occurs when a principal sanctions the prior actions of its purported agent.'" FTC Br. at 13 (quoting *Wilkes-Barre Hosp. Co.*, 857 F.3d at 371). This quote, however, comes from *Doolin Sec. Sav. Bank, F.S.B. v. Off. of Thrift Supervision*, 139 F.3d 203, 212 (D.C. Cir. 1998), which involved once again the authority of a properly appointed official (director of OTS) to ratify the acts of his improperly appointed predecessor. And the quotation was merely restating agency law: "Ratification occurs when a principal sanctions the prior actions of its purported agent." *Id.* (citing *See* RESTATEMENT (SECOND) OF AGENCY § 82 (1958)). The word "principal" in that sentence refers to the principal-agent relationship, not to *principal officers*.

The only other authority cited by Defendants is the district court decision in *Braidwood*, which Plaintiffs did rely on for several points. But on this point, *Braidwood* got it wrong. The district judge in that case did not decide the Appointments Alause issue as to two bodies of officers because their acts were only effective upon the HHS Secretary's approval. *Braidwood Management Inc. v. Becerra*, No. 4:20-CV-00283-O, 2022 WL 4091215, at *7-*8 (N.D. Tex. Sept. 7, 2022). But, to repeat, that only matters for determining whether those officers were inferior or principal. Had the district court in *Braidwood* done the analysis in the correct order and concluded that the officers were inferior officers, the court would surely have recognized that all appointments claims involving inferior officers would be moot if a principal officer could ratify their actions.

In sum, every single case but one (*Braidwood*) on which Defendants rely stands for the proposition that a properly appointed officer can ratify the acts of an improperly appointed predecessor to that same office. Only *Braidwood* appears to hold that a principal can ratify the acts of an inferior; but that is contrary to the weight of authority, and the district court appeared unaware that such a holding would effectively allow Congress to write inferior officers out of the Constitution.

### C.   The Authority's Directors are still non-inferior officers.

It is true that, with Congress's recent amendment to HISA, the Directors are no longer principal officers under the Supreme Court's modern precedents because their decisions are sufficiently reviewed by superior officers.   As demonstrated above, however, they remain at least inferior officers that were not properly appointed. Nevertheless, Plaintiffs reserve the right to make an originalist argument that the Directors, although not principal officers, are nonetheless non-inferior officers subject to appointment by and with advice and consent of the Senate.

This conclusion follows from a simple premise: the Appointments Clause refers only to inferior officers, and the Opinions Clause refers to "*the* principal Officer in each of the executive Departments." U.S. Const. art. II § 2, para. 1 (emphasis added). In other words, although modern precedent distinguishes between two kinds of officers—principal and inferior—there are actually *three* kinds of officers: there is *the* principal officer in each executive department; there are "such inferior officers" whose appointments Congress may by law vest in the President alone, a principal officer, or a court of law; and there are non-inferior officers, i.e., those officers whose duties are sufficiently important that they must be appointed by and with advice and consent, but who are not the principal officer

of the department.

Such a framework would better explain important cases, for example why the Patent Trial and Appeal Board judges must be appointed by and with advice and consent even though their work is supervised to a great degree by a Director. *See United States v. Arthrex*, 141 S. Ct. 1970 (2021) (holding that the PTAB judges were principal officers because some of their decisions are unreviewable); *id.* at 1998 (Thomas, J., dissenting) (arguing that PTAB judges were inferior officers because there were two levels of supervision above them). A better answer might be that the PTAB judges are non-inferior officers, whose work is supervised by the head of the department but whose duties are sufficiently important and independent to require Senate confirmation.[7]

The Authority's Directors are good candidates for this category. That is because they have enormous powers even before the FTC reviews their actions, *if the FTC reviews their actions at all*. For example, they can search and seize documents with no judicial authorization. And they get to make legislative rules which the FTC can choose to, but need not, revise. It is the *Authority* that "shall establish" anti-doping, medication, and racetrack safety rules. 15 U.S.C. §§ 3055(a)(1), 3056(a)(1). The FTC *cannot initiate any rulemaking on its own*; under Congress's amendment, it can only "abrogate, add to, and modify" existing Authority rules. 15 U.S.C. § 3053(e). Indeed, because the FTC must wait

---

[7]  This framework also comports with what James Madison said in the Constitutional Convention, when he suggested there were heads of department, superior officers, and inferior officers. 2 Records of the Federal Convention of 1787, at 627 (M. Farrand ed. 1911) ("Superior Officers below Heads of Departments ought in some cases to have the appointment of lesser offices"); *see also Edmond v. United States*, 520 U.S. 651, 667 (1997) (Souter, J., concurring) ("It does not follow, however, that if one is subject to some supervision and control, one is an inferior officer. Having a superior officer is necessary for inferior officer status, but not sufficient to establish it.").

until after a rule is promulgated and go through a second rulemaking process if it wants to abrogate or modify that rule, the Authority's legislative rules always govern for at least some period of time and may indeed govern forever.

But even if this concept is wrong, the Directors are still inferior officers that have not been properly appointed. Because Congress has not by law vested their appointments in the President or the head of the department, advice and consent is required. Nor has the President or head of department even attempted to appoint them. They simply appointed themselves.

### D.    Plaintiffs have standing to bring their appointments and removal claims.

The Authority—but not the FTC—argues in passing that Plaintiffs do not have standing to bring their appointments and removal claims because those claims "rely on generalized concerns about the Board's authority to 'compel compliance with subpoenas,' 'compel testimony,' 'conduct searches and seizures,' and carry out other investigative and enforcement activities that the Board has never exercised, or even threatened to exercise, against these Plaintiffs." Authority Br. at 18-19.

This half-hearted standing argument falters for two reasons. First, the Plaintiffs are subject *now* to a whole host of Authority rules. Those rules were approved by the FTC, but that matters not a bit because the FTC can only approve rules supplied by the Authority. And the Authority is not properly constituted. Therefore, all of the legislative rules to which Plaintiffs have already been subjected are invalid, and that invalidity stems from the appointments and removal claims that Plaintiffs raise. This was recognized by this Court in *NHBPA*: "The statute requires the regulations to take effect on July 1, 2022, and no one disputes that the [plaintiffs] will be the 'objects' of regulations adopted under

HISA." Case 5:21-cv-00071-H, Dkt. 92 at 11-12. To say that Plaintiffs don't have standing to challenge these rules because they are ultimately promulgated by the FTC is to beg the very question at issue.

Second and independently, Plaintiffs have had to *consent* to a variety of enforcement, investigative, and adjudicatory rules that they believe to be unconstitutional as a condition for registering to continue to participate in the industry. If they had refused consent on that ground, they would unquestionably have standing. The law does not require them to sacrifice their occupations in order to challenge unconstitutional conditions. *Cf. Free Enter. Fund*, 561 U.S. at 490 ("We normally do not require plaintiffs to bet the farm . . . before testing the validity of the law.") (cleaned up). They can conditionally consent to them while bringing a declaratory judgment action to test their validity in court. *See, e.g.*, *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 797-98 (9th Cir. 2001) (standing to challenge ordinance where city conditioned "business licenses" on consenting to "allegedly unreasonable search[es]"); *Clark v. Cnty of Placer*, 923 F. Supp. 1278, 1287 & n.16 (E.D. Cal. 1996) (standing exists where a racecar driver compelled to sign a litigation waiver as a condition of racing).

### III.   HISA violates the nondelegation doctrine, including the private nondelegation doctrine because the Authority is not a self-regulatory organization.

HISA also violates the nondelegation doctrine, whether the Authority is considered private or public. Even if the Court concludes the Authority is a private entity, Congress's recent amendment does not fix the constitutional infirmity under the private nondelegation doctrine. That is because the cases upholding the Maloney Act depend on the various securities associations being voluntary, self-regulatory organizations. Here, in contrast,

the situation is similar to *Schechter Poultry*, where the Supreme Court invalidated on nondelegation grounds a statute that empowered private industry groups to make regulations for other participants in the industry, subject to approval of the President. And whether or not the Authority is a government actor, the statute also violates the "public" nondelegation doctrine on numerous grounds.

### A.    If the Authority is private, HISA violates the private nondelegation doctrine.

If the Authority is held to be a private entity, HISA would nevertheless be unconstitutional. Congressional delegation of regulatory authority to "private persons" is "legislative delegation in its most obnoxious form." *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936). Accordingly, while Congress may delegate regulatory authority to other branches in certain circumstances, "[f]ederal lawmakers cannot delegate regulatory authority to a private entity" at all. *Ass'n of Am. R.R.s. v. U.S. Dep't of Transp.*, 721 F.3d 666, 670 (D.C. Cir. 2013), *vacated and remanded on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.R.s.*, 575 U.S. 43 (2015).

As explained in Plaintiffs' opening brief, Courts have upheld Congress's delegation of authority to "self-regulatory organizations" in the securities industry, and primarily to FINRA or its predecessor NASD, the rules of which are subject to approval by the SEC under the Maloney Act of 1938. *See, e.g.*, *Aslin v. Fin. Indus. Regul. Auth., Inc.*, 704 F.3d 475, 476 (7th Cir. 2013); *Sorrell v. SEC*, 679 F.2d 1323, 1326 (9th Cir. 1982); *Todd & Co. v. SEC*, 557 F.2d 1008, 1012 (3d Cir. 1977). The Fifth Circuit in *NHBPA* held HISA unconstitutional, however, because unlike the SEC with respect to FINRA, the FTC could not unilaterally "abrogate" or "amend" the Authority's proposed rules. Maloney Act, Pub. L. No. 75-719, § 15A(k)(1), 52 Stat. 1070, 1074 (1938); 15 U.S.C. § 78s(c). In response

to the Fifth Circuit decision, Congress amended HISA to grant the FTC power to "abrogate, modify, or add to" the rules enforced by the Authority. Consolidated Appropriations Act, 2023, div. O, tit. VII, § 701 (2022).

The Fifth Circuit refused to vacate its decision, however, leaving the implications of the amendment for the district courts to sort out in the first instance. And Congress's "make over" fixes nothing at all, for two reasons. First, the Authority still has significantly more power than does FINRA. Second, and relatedly, the Authority *is not a self-regulatory organization at all*, and the precedents upholding the Maloney Act are inapposite.

### 1. Congress's amendment does not address the Fifth Circuit's concerns.

As the Fifth Circuit noted in *NHBPA*, "It is 'the Authority'—not the FTC—that 'shall establish' the anti-doping, medication, and racetrack safety programs." 53 F. 4th at 883. "And it is 'the Authority'—not the FTC—that 'shall issue' descriptions of rule violations, and 'shall establish' sanctions for them." *Id*. at 882 (cleaned up). This "generous grant of authority to the Authority to craft entire industry 'programs' strongly suggests it is the Authority, not the FTC, that is in the saddle." *Id*. at 883. Nothing in the recent amendment changes the process by which the FTC reviews Authority rules at the initial stage. The FTC still "shall approve" whatever rules the Authority sends it as long as they are "consistent" with HISA and the Authority's rules. 15 U.S.C. § 3053(c)(2). The amendment did not change this. If proposed "rules are 'consistent' with HISA's broad principles, the FTC *must* approve them." *NHBPA*, 53 F.4th at 872 (emphasis original).

In its first order approving a rule post-amendment, the FTC reemphasized this very point: "'The Commission shall approve a proposed rule or modification if the Commission finds that the proposed rule or modification is consistent with' the Act and applicable rules

approved by the Commission." FTC Order, Jan. 9, 2023, at 1–2. The FTC approved the proposal because it "is consistent with the Act and the Commission's procedural rule." *Id*. The accompanying press release similarly said, "The Act requires that the FTC approve submitted rules if it finds that they are 'consistent with' the Act and the FTC's procedural rules governing the submission process." FTC, Press Release (Jan. 9, 2023).[8] And it is still the case that, as the Fifth Circuit held, the "baseline" standards found in HISA are so "open-ended" that "[s]aying a rule is or is not 'consistent' with [those] standard[s] says next to nothing." *NHBPA*, 53 F.4th at 885. This unchanged "high-altitude" review "hardly subjects the Authority's rules to 'independent' oversight." *Id*.

More still, because the FTC must wait until after a rule is promulgated and then go through a second rulemaking process to abrogate or modify that rule if it wants to do so, the legislative rules of the Authority govern for at least some period of time, if not forever. The constitutional problem remains: for some period of time, a private corporation made federal law and applied it to its industry's participants.[9]

The FTC, moreover, still has no power to *initiate* any rulemakings (despite the Sixth Circuit's unsupported statement to the contrary). And that matters. In *National Park & Conservation Ass'n v. Stanton*, environmental groups sued over the National Park Service's delegation of authority to an "independent local council," a private entity, to

---

[8] https://www.ftc.gov/news-events/news/press-releases/2023/01/ftc-approves-horseracing-integrity-safety-authoritys-proposed-assessment-methodology-rule.

[9] The Sixth Circuit addressed this problem by suggesting the FTC could adopt a procedural rule delaying the effective date of new rules so that the FTC can complete its review process before it goes into effect. *Oklahoma v. U.S.*, 2023 U.S. App. LEXIS 5169 at *21 (March 3, 2023). But the proponents of a facial challenge need not "disprove every possible hypothetical situation in which the restriction might be validly applied." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

manage a scenic river. 54 F. Supp. 2d 7 (D.D.C. 1999). Those groups claimed that the local council's *inaction* was causing them harm. The D.C. District Court concluded that the delegation of NPS's "statutory management duties to the Council violates the unlawful delegation doctrine because NPS retains no oversight over the Council" and "no final reviewing authority over the council's actions *or inaction*." *Id.* at 20 (emphasis added).

None of the precedents upholding private delegations comes even close to supporting the present scheme. In *Adkins*, for example, the private organization offered only the proposed minimum coal price, which the agency could completely rewrite before adopting. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940). Similarly, in *Texas v. Rettig*, 987 F.3d 518 (5th Cir. 2021), "the private board contributed to a small part of the regulatory scheme." *NHBPA*, 53 F.4th at 889. HISA, by contrast, "entrusts the entire regulatory scheme to the Authority, fettered only by the FTC's limited review." *Id*.

And none of the private nondelegation precedents touches on the *non-legislative* powers that the purportedly private Authority continues to exercise free of FTC control. HISA and the Enforcement Rule grant the Authority the power to issue subpoenas, 15 U.S.C. § 3054(c)(1)(A)(ii) and R. 8400(d), to inspect documents or facilities, 15 U.S.C. § 3054(c)(1)(A)(i); R. 8400(a)(1), and even to seize materials. R. 8400(a)(2). Any FTC review comes only after the Authority has concluded its investigation, issued a sanction, and an appeal is opened. If the Authority perennially delays closing a case, the FTC can never review the exercise of these powers. If the Authority closes a case but does not issue a sanction, the FTC has no way to review its choice. And there is certainly no requirement that the FTC pre-approve a subpoena, inspection, or seizure, even though a

magistrate judge would need to approve a warrant before an identical act by the FTC itself. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 325 & n.23 (1978). More still, the Authority may even "commence a civil action" and seek a temporary restraining order or a temporary or permanent injunction with no FTC oversight. 15 U.S.C. § 3054(j).

Finally, under HISA, "covered persons" register directly with the Authority rather than with the FTC. 15 U.S.C. § 3054(d). The SEC, by contrast, directly licenses all brokers and dealers, 15 U.S.C. § 78o(b)(1), and may punish them directly, 15 U.S.C. § 78o(b)(4). If FINRA (or any other securities association) decides not to take an enforcement action under the association's own rules, the SEC can step in to enforce *its* rules. The FTC has no similar power here. *Compare Stanton*, 54 F. Supp. 2d at 20 (no power to review inaction of private entity creates nondelegation problem), *with Am. Horse Prot. Ass'n v. Veneman*, No. 01-00028 (HHK), 2002 WL 34471909, at *5 (D.D.C. July 9, 2002) (that agency can step in and enforce rules if private entity "is not taking steps to detect and penalize violations" resolves nondelegation problem).

The nub of the matter is that the Fifth Circuit invalidated HISA because the FTC did not exercise sufficient control over the Authority. Congress amended the statute to give the FTC one additional opportunity for control, but that does not go nearly far enough. The SEC has far more *direct* control over the securities industry than the FTC has over the horseracing industry, and neither *Adkins* nor *Rettig* speaks to the invasive and pervasive investigatory and adjudicatory powers of a private entity.

> ## 2. *Because the Authority is not a self-regulatory organization, it is just a private industry group making rules for other members of the industry—a delegation "utterly inconsistent with" and "unknown to" our law.*

Even if Congress's amendment gives the FTC the same power over the Authority

that the SEC has over FINRA, Congress's "fix" would still not resolve the constitutional infirmity. That is because, as already explained, the Authority is not a "self-regulatory" organization at all but rather an "other-regulatory" organization that makes rules that bind private third parties. And all Covered Persons are compelled to be subject to the Authority. Unlike the Maloney Act and its amendments which do not mention any specific securities association by name, HISA mentions the Authority by name 162 times. That is because HISA does not provide for the regulation of existing and competing associations of members in the horseracing industry but is rather an organic statute empowering a new regulating agency.

The implications are significant. If the Authority is indeed a private organization, but not a self-regulatory one, then it is like the private organizations in *Schechter Poultry* that purported to make codes of fair competition for their industries, subject to approval by the President. In that case, the National Industrial Recovery Act authorized the President to promulgate "codes of fair competition for" various industries "[u]pon the application to the President by one or more trade or industrial associations or groups." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 521 & n.4 (1935). The President's discretion to approve the codes was nearly unfettered given the broad standards of the Act.

The Supreme Court held this arrangement unconstitutional:

> The government urges that the codes will 'consist of rules of competition deemed fair for each industry by representative members of that industry—by the persons most vitally concerned and most familiar with its problems.' Instances are cited in which Congress has availed itself of such assistance; as, e.g., in the exercise of its authority over the public domain, with respect to the recognition of local customs or rules of miners as to mining claims, or, in matters of a more or less technical nature, as in designating the standard height of drawbars.

> But would it be seriously contended that Congress could delegate its legislative authority to trade or industrial associations or groups so as to empower them to enact the laws they deem to be wise and beneficent for the rehabilitation and expansion of their trade or industries? Could trade or industrial associations or groups be constituted legislative bodies for that purpose because such associations or groups are familiar with the problems of their enterprises? . . . Such a delegation of legislative power is unknown to our law, and is utterly inconsistent with the constitutional prerogatives and duties of Congress.
>
> The question, then, turns upon the authority which section 3 of the Recovery Act vests in the President to approve or prescribe.

*Id.* at 537 (first paragraph break added).

In other words, the Supreme Court suggested that delegations to private industry participants to make rules for their respective industries were "unknown to our law" and "utterly inconsistent" with the Constitution. At least in *Schechter Poultry*, the President had total discretion to approve or prohibit the rules, making it a public nondelegation case; here, in contrast, the FTC *must* approve the rules if in conformity with the statute, and then *may*, but need not, abrogate or modify the rules in subsequent rulemakings. That is, here the private delegation is worse because the FTC must generally approve the private industry group's rules for its industry.

In short, even now Congress's statute is far different from the Maloney Act: the Authority is not a voluntary, self-regulatory association, but rather a private industry group that makes regulations for its own industry, with only optional and occasional oversight from an actual government agency. That violates the private nondelegation doctrine. Congress's "fix" fixed nothing.

### B.    HISA violates the public nondelegation doctrine.

Whether the Authority is public or private, HISA also violates the public nondelegation doctrine. First, if the Authority is public but not exercising executive power,

then it is exercising naked legislative power. Second, the absence of a notice and comment requirement makes its discretion too broad.

### 1.    *The Directors exercise naked legislative power.*

First, if the Directors are government actors but not exercising executive power (for which they do not have proper appointments), then their promulgation of legislative rules constitutes an exercise of the legislative power that cannot be delegated by Congress. As noted in Plaintiffs' opening brief, administrative agencies can ordinarily promulgate legislative rules because some degree of policymaking discretion inheres in law execution. *Mistretta v. United States*, 488 U.S. 361, 417 (1989) (Scalia, J., dissenting). Thus, if the Authority is promulgating binding legislative rules altering the rights and obligations of private parties but is not otherwise exercising executive or judicial power, then it would be nakedly exercising legislative power. The intelligible principle standard would not apply because *any* exercise of legislative power not incident to a lawful exercise of executive or judicial power, is "legislative power" that cannot be delegated. *Mistretta*, 488 U.S. at 420 (Scalia, J., dissenting).

Neither the FTC nor the Authority has any response to this argument. Presumably they think that Congress's recent amendment fixes this problem. But it does no such thing because even if the FTC wanted to amend or abrogate a rule, it would have to do so through a new rulemaking, which means the Authority's legislative rules will have been in effect for some period of time. And because the FTC must still approve any rule if in conformity with the Act, some of the Authority's legislative rules, based on the Authority's own policy choices, will govern forever when the FTC chooses not to amend or abrogate a rule. The Authority would still be nakedly exercising legislative power.

### 2. Lack of a notice and comment requirement gives the Authority too much discretion.

Second, if the Authority is a government agency, then it is exercising legislative power because its rules are based on broad statutory standards combined with an absence of notice and comment rulemaking as to the substance of those rules. The Court will recall that the statutory factors still leave wide-ranging discretion. For example, the Authority has promulgated a schedule of civil sanctions providing for $50,000-$100,000 per violation of its racetrack safety rules. Rule 8200(b)(2)(ii), 87 Fed. Reg. 4028 (Jan. 16, 2022). The Authority could have chosen fines of $1,000,000 and the FTC would have had nothing to say because "[t]he Commission [found] that proposed Rule 8200 is consistent with the Act," since "[t]he list of available sanctions satisfies the Act's requirement of 'a schedule of civil sanctions for violation.'" FTC, March 25 Order, at 14-15 (quoting 15 U.S.C. § 3052(a)(8)).

This example illustrates how far HISA strays from the ordinary notice-and-comment process under the Administrative Procedure Act, which cabins the discretion of most agencies. Agencies would not be free to impose a $1 billion fine (and probably would not impose a $100,000 per-violation fine) because they would have to respond to public comments on the merits of their proposals and show that their rules are not arbitrary and capricious. 5 U.S.C. § 553, 706(2)(a). Under HISA, however, the FTC must consider public comments only on whether the Authority's rules are "consistent with" the statute; as written, HISA does not permit the FTC to consider public comments on the substantive merits of the rules themselves, and the FTC itself has interpreted HISA this way.

The Authority's *only* response to this point is that the Authority *itself* "solicits and responds to public comments on the substance of its rules." Authority Br. at 38 (citing 16

C.F.R. § 1.142(f)). But this response is a non-starter. It is well established that an agency cannot cure a nondelegation problem by narrowing the scope of its own authority. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 472 (2001). And although it is true that the requirements of the APA are not generally required as a constitutional matter, the whole point is that here some such requirements are required *if* Congress wants otherwise to delegate such broad lawmaking authority.

More still, it appears that the substance of the Agency's rules is not subject to arbitrary and capricious review. That is because APA § 706(2)(a) provides that an agency's action may be set aside as arbitrary and capricious. But the FTC's actions cannot be arbitrary and capricious so long as the substantive policies are consistent with the wide-ranging discretion left by the statute. And the Authority's actions cannot be subject to arbitrary and capricious review if the Authority, under the statute, is not an even an agency. The Authority's only response to this point is that in another case, the D.C. Circuit reviewed an SEC approval of a self-regulatory organization's rules under the arbitrary and capricious standard. Authority Br. at 38-39 (citing *Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 446-447 (D.C. Cir. 2017)); *see also* FTC Br. at 25-26. But in *Susquehanna*, the D.C. Circuit found the SEC's approval arbitrary and capricious because the SEC did not make any *finding* that the organization's rules were in fact consistent with the Act. Nothing in that case suggests that the court could have reviewed the underlying substance of those rules under the arbitrary and capricious standard.

Thus, as noted in Plaintiffs' opening brief, the *substance* of the Authority's rules is not subject to notice-and-comment as a statutory requirement, and appears not to be subject to judicial review of reasonableness. The Authority therefore has far broader

discretion to fashion legislative rules than do most agencies. This absence of the notice-and-comment process, and/or the absence of judicial review, necessitates correspondingly stricter statutory standards. HISA lacks such standards.

## IV. HISA violates Article III, the Seventh Amendment, and the Fourth Amendment of the U.S. Constitution.

Defendants' arguments as to Plaintiffs' Article III, Seventh Amendment, and Fourth Amendment claims fare no better. First, the Authority—but not the FTC—argues Plaintiffs do not have standing to bring these claims. Not so. Plaintiffs were forced to consent to violations of these rights as conditions of registration; they therefore have standing to challenge these conditions as unconstitutional. More still, the Authority has threatened enforcement actions now that Lone Star Park's racing season has begun. *See* Authority Resp. to Plaintiffs' TRO Application [Dkt. 56] at 17-19.

On the merits of the Article III and Seventh Amendment claims, the Defendants merely parrot contrary authority that Plaintiffs already highlighted, without explaining why this Court should follow their preferred authorities when other authorities are more consistent with the Constitution's original meaning. And on the Fourth Amendment claim, consent does not cure a Fourth Amendment problem when that consent is given under threat of losing a license, as was the case here.

### A. Plaintiffs have standing.

In an argument that the FTC does not join, the Authority claims Plaintiffs lack standing to bring their Article III, Seventh Amendment, and Fourth Amendment claims. But Plaintiffs have standing for three independent reasons. First, Congress and the Authority have forced Plaintiffs to consent to unconstitutional conditions that implicate those constitutional provisions as a condition of registration. Second, the Authority has

promulgated legislative rules creating the specific judicial procedures to which Plaintiffs were forced to consent, and which are binding on Plaintiffs here and now. Third, the Authority has threatened enforcement actions now that one of the Plaintiffs has begun their racing season. *See* Authority Resp. to Plaintiffs' TRO Application [Dkt. 56] at 17-19.

First: As the FTC itself recognizes, HISA requires all Covered Persons to "register with the Authority," and specifies that such registration "*shall include an agreement* by the covered person to be subject to and comply with the rules" approved by the FTC. 15 U.S.C. § 3054(d)(1)-(2) (emphasis added). In its explanatory comment to the Registration Rule, the Authority wrote, "The Registration proposed rule includes a provision that requires a Covered Person to agree to these rules, standards, and procedures, and further states that these rules, standards, and procedures are set forth in the Authority's Rule 8000 Series." 87 Fed. Reg. at 29864. Additionally, "[t]he Authority's registration website also requires the Covered Person to affirm this agreement and provides a link to the Rule 8000 Series if the Covered Person desires to read the rules." *Id.* Rule 9000(g) specifically provides that "a Covered Person who registers with the Authority shall agree to be subject to and comply with the rules, standards, and procedures of the Authority developed and approved under 15 U.S.C. § 3054(c)," which "rules, standards, and procedures are set forth in the Rule 8000 Series." That series includes all the rules about the Authority's investigatory, enforcement, and adjudicatory powers. *See* Rules 8340; 8400(a).

Plaintiffs therefore have standing because they were forced to "consent" to subject themselves to these unconstitutional conditions to maintain their livelihoods, and they are entitled to a declaratory judgment that those conditions are unconstitutional. After all, had

they refused to consent because they believed the conditions violated their constitutional rights, then they certainly would have had standing. Thus, it follows that they can consent in the interim while bringing a declaratory judgment action to challenge the unconstitutional conditions; otherwise the law would perversely require an individual to give up his livelihood in order to challenge such a condition. *Cf. Free Enter. Fund*, 561 U.S. at 490 ("We normally do not require plaintiffs to bet the farm . . . before testing the validity of the law.") (cleaned up).

The Ninth Circuit has found standing for tenants where landlords had to "consent to an allegedly unreasonable search," or "the City will deprive their landlords of business licenses." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 797 (9th Cir. 2001). Elsewhere in that same opinion, the court found that the landlords had standing because where an ordinance "requires the landlords to invade the Fourth Amendment rights of their tenants in order to obtain their business licenses," that is an injury-in-fact. *Id.* at 798; cf. *Vonderhaar v. Vill. of Evendale*, 906 F.3d 397, 399 (6th Cir. 2018) (finding no standing to challenge warrantless administrative inspection scheme where the village "believes" the code "permits no such thing").

And in *Clark v. County of Placer*, the district court found standing where a racecar driver was compelled to sign a litigation waiver as a condition of racing. The "requirement of the surrender of the right to sue as a precondition to racing invokes the doctrine of unconstitutional conditions," for which she had standing. 923 F. Supp. 1278, 1287 (E.D. Cal. 1996). More still, the district court noted that had the driver *consented* in order to race—as Plaintiffs have done here—then "the related doctrine of compelled waiver of constitutional rights would be invoked." *Id.* at 1287 n.16; *cf. also Koontz v. St. Johns River*

*Water Management District*, 570 U.S. 595, 607 (2014) (Court has invalidated statutes requiring a corporation, "as a condition precedent to obtaining a permit to do business within the State, to surrender a right and privilege secured to it by the Constitution") (quoting *Southern Pacific Co. v. Denton*, 146 U.S. 202, 207 (1892)).

The Authority's only cited case, *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325 (5th Cir. 2017), is distinguishable. True, the Fifth Circuit found no standing to bring a Seventh Amendment claim where a district court adjudication might (but might not) occur in the future. Here, however, Plaintiffs have been forced to consent to forgoing their Seventh Amendment rights as a condition of operating their business; that crucial element was not present in the *TOTAL Gas* case. *See also MA LEG Partners 1 v. City of Dallas*, 442 F. Supp. 3d 958, 968 (N.D. Tex. 2020) (plaintiff would have standing to sue if "the City conditioned a benefit on [plaintiff] waiving its constitutional rights").

Second, Plaintiffs have standing for another reason: because the Authority *promulgated* Rule 8340, 87 Fed. Reg. 4029 (Jan. 26, 2022), which establishes the specific judicial procedures to which Plaintiffs had to consent and which Plaintiffs contend is unconstitutional. In other words, there is an existing, legislative rule that binds the Plaintiffs here and now to those procedures. *See National Horsemen's*, Case 5:21-cv-00071-H, Dkt 92 at 11-12 (finding standing because "[t]he statute requires the regulations to take effect on July 1, 2022, and no one disputes that the [plaintiffs] will be the 'objects' of regulations adopted under HISA").

Third, the Authority has promised to impose enforcement actions against Lone Star Park when its racing season commences next week if Lone Star Park participates in the interstate export of a simulcast race signal.  Lone Star Park will therefore be forced either

to forgo simulcasting (and the millions in revenue associated with it) or risk sanctions from the Authority and any complications to its operations that may also result. *See* Authority Resp. to Plaintiffs' TRO Application [Dkt. 56] at 19 ("[There was no] reason for Lone Star Park (or anyone) to think Defendants would ignore their statutory mandate to enforce HISA rules against racetracks that export their signals, *particularly in light of the Authority's clear and consistent statements that it would do so*.").

### B.    Liberty and property are private, not public, rights.

Defendants agree that whether this matter must be heard in an Article III court, and whether a jury is required, are questions whose answers depend on whether the matters that the Authority and FTC can adjudicate involve public or private rights.[10] As Plaintiffs explained in their opening brief, "private rights" are rights that persons would have had in the state of nature, as modified by the civil law, such as the rights to life, liberty, and to acquire and possess property; "public rights" are rights belonging to the public or are entitlements private individuals can claim from the government. Plaintiffs explained that seeking monetary penalties and imposing lifetime bans on private persons engaging in an otherwise lawful and ordinary occupation such as horseracing, 15 U.S.C. § 3057(d)(3)(A), involve core private rights to liberty and property.

Indeed, to the extent the private/public distinction is rooted in sovereign immunity, *see N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 67 (1982) (the public rights doctrine "may be explained in part by reference to the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its

---

[10] Neither the Authority nor the FTC questions that a "complete remedy at law" exists for "monetary penalties," and therefore a jury is required if the matters the Defendants adjudicate involve private rights that must be heard in Article III courts.

consent to be sued"), the Authority adjudicates matters of private right because sovereign immunity does not apply to cases in which the government seeks to impose monetary penalties or to prohibit an individual from an industry. Thus, the provisions authorizing the Authority and FTC to try such matters rather than a district court with a jury violate Article III and the Seventh Amendment, as do the Authority's regulations putting those provisions into effect. *See* 15 U.S.C. §§ 3054(i); 3057(a)-(d) (authorizing civil sanctions, including "monetary fines and penalties" and "lifetime bans from horseracing"); Rule 8340, 87 Fed. Reg. 4029 (Jan. 26, 2022) (providing various adjudicatory rules for the "initial hearing before the Board").

In its response, the FTC attempts to broaden the definition of public rights. The FTC claims first that public rights are those "pertaining to claims brought by or against the United States." FTC Br. at 30-31. Certainly claims brought *against* the United States are covered by sovereign immunity. But that is not so for claims that the United States brings against others, such as for monetary penalties. If all such cases were public rights, then so would be all cases in which the United States brings prosecutions for violations of criminal laws that could result in terms of imprisonment or even death. Of course, that is absurd—life and liberty are core private rights, regardless of whether the dispute is between two private parties or the government is bringing a prosecution. The FTC's novel test for what constitutes public rights cannot be correct.

The FTC also argues that "where the right[s] to relief 'flow[s] from a federal statutory scheme' or is 'completely dependent upon adjudication of a claim created by federal law,'" such rights are "are public rights." FTC Br. at 31 (quoting *Stern v. Marshall*, 564 U.S. 462, 490-91, 493 (2011)). That, too, is absurd. Under this test, federal laws

{06808981.3}

against bribing federal officials—flowing entirely from and dependent entirely upon a "federal statutory scheme" and "federal law"—could be adjudicated by administrators (say, a Federal Bribery Commission) without judge or jury. This test also cannot be right.

That leaves only one other test of which the FTC can avail itself: public rights are "statutory rights that are integral parts of a public regulatory scheme and whose adjudication Congress has assigned to an administrative agency or specialized court of equity." FTC Br. at 31 (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 54–55 n.10 (1989)). The problem with this argument is the Fifth Circuit's opinion in *Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022): Unlike in other such specialized administrative schemes, here Congress has allowed the Authority to file its actions in federal court—suggesting that Congress thought the courts perfectly capable of handling these types of traditional claims. *Jarkesy*, 34 F.4th at 454.

To be sure, the Authority tries to distinguish *Jarkesy* in other ways. It argues that "an SEC enforcement action implicated a private right because fraud claims are traditional legal claims that arose at common law," while "the same cannot be said for HISA enforcement actions, which center on violations of technical anti-doping, medication-control, and racetrack-safety regulations." Authority Br. at 44 (cleaned up; quoting *Jarkesy*, 34 F.4th at 458). On this account, any federal statute creating new crimes after, say, 1850 could plausibly be said to be "technical" regulations. Violations of environmental, antitrust, and consumer safety laws could be considered "technical" violations that need not be tried by a real judge and jury. On the Authority's reasoning, it would appear that only murder, theft, and fraud must be tried by a jury. That demonstrates the fallacy of the Authority's reasoning: There is nothing "technical" about prohibiting the

drugging or mistreatment of animals, and there is no reason the government should get special solicitude in such matters.

Contrary to the Authority's assertion, Plaintiffs are not trying to "shoehorn *any* action 'seeking monetary payments' into the category of traditional common law claims." Authority Br. at 44. That is simply what precedent requires. If the agency is seeking monetary penalties, that is a "traditional legal claim" that arose at common law. *See Tull v. United States*, 481 U.S. 412, 418 (1987) ("After the adoption of the Seventh Amendment, federal courts followed this English common law in treating the civil penalty suit as a particular type of an action in debt, requiring a jury trial."); *id.* at 422 ("A civil penalty was a type of remedy at common law that could only be enforced in courts of law."). Congress had the choice whether to empower the Defendants to issue monetary penalties. It must live with the consequences of that choice.[11]

Simply put, HISA authorizes the administrative adjudication of matters that involve private rights as a matter of both first principles and the Supreme Court's and the Fifth Circuit's precedents.

### C. Regulation 8400 violates the Fourth Amendment.

Neither the Authority nor the FTC seriously challenges Plaintiffs' Fourth Amendment claim. First, both say in passing that the rule has been modified. Authority

---

[11] *CFTC v. Schor* is also inapposite. There, Congress created a violation of the statute that would require one party to pay reparations to another, which paralleled an existing common law cause of action between two private individuals. 478 U.S. 833, 854 (1986). The Court insisted that its ruling applied only "over a narrow class of common law claims as an incident to the CFTC's primary, and unchallenged, adjudicative function." *Id.* Here, Plaintiffs challenge the Authority's adjudicative functions, and the "claim" is not a narrow one at all, but rather involves the government seeking monetary penalties, which is a broad category of cases.

---

Br. at 17; FTC Br. at 6. But they do not say *how* it has been modified, and whether it has been modified in any way meaningfully relevant for Plaintiffs' argument. The problem for Defendants is that Plaintiffs' opening brief *explicitly cited the modified* rule, explaining that it modifies the rule about which Plaintiffs are complaining in "immaterial" respects. Opening Br. at 56. Defendants do not challenge that assertion. Nor could they. The existing rule still provides that the Authority "shall have free access to" the "books, records, offices, racetrack facilities, and other places of business of Covered Persons," and that it may "seize any medication, drug, substance, or paraphernalia in violation or suspected violation of any provision of 15 U.S.C. Chapter 57A or the regulations of the Authority, and any object or device reasonably believed to have been used in furtherance of the violation or suspected violation." Rule 8400(a)(1)-(2), 87 Fed. Reg. 44044. Nothing about the new rule affects Plaintiffs' claim.

The FTC and Authority also both rely on the erroneous notion that Plaintiffs have consented to unlawful searches, and consent cures a Fourth Amendment violation. The problem for the Defendants on this score is twofold. First, all of the FTC's cited cases involve public privileges like welfare benefits. *See* FTC Br. at 34-35 (citing cases involving consenting to conditions to obtain government contracts, to secure Medicare or Medicaid funding, or to participate in other federal benefits programs). As then-Professor Kathleen Sullivan has explained, the government is allowed to condition "benefits that government is permitted but not compelled to provide" on forgoing otherwise protected constitutional rights. Kathleen M. Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1422 (1989). But the government is *not* allowed to violate constitutional rights generally. In other words, neither Congress nor the Authority can get around the Constitution by

making everything prohibited, and then allowing people to engage in the relevant activity through a license on the condition they give up their constitutional rights. Horseracing is not a "federal program" like Social Security, Medicare, or government contracting—it is an ordinary, lawful occupation that preexists the government.

Even if consent could validate government action beyond approving welfare benefits, numerous cases have held that when the alternative to consenting is losing a license or other valuable benefit, or criminal penalties, that consent is not voluntary. *See, e.g.*, *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 873 (11th Cir. 2013) (unconstitutional for "the State [to offer] its employees this Hobson's choice: either they relinquish their Fourth Amendment rights and produce a urine sample which carries the potential for termination, or they accept termination immediately."); *Thompson v. Oakwood*, 307 F. Supp. 3d 761, 775 (S.D. Ohio 2018), modified, No. 3:16-CV-169, 2018 WL 9944970 (S.D. Ohio Apr. 4, 2018) (consent to warrantless inspection as condition of receiving a certificate of compliance necessary to sell property was not voluntary); *Makula v. Vill. of Schiller Park*, 1995 WL 755305, at *6 (N.D. Ill. 1995) (consent to administrative search was not voluntary where failure to do so resulted in forfeiture of apartment building owner's right to operate its property); *Sokolov v. Vill. of Freeport*, 420 N.E.2d 55, 57 (N.Y. 1981) ("A property owner cannot be regarded as having voluntarily given his consent to a search where the price he must pay to enjoy his rights under the Constitution is the effective deprivation of any economic benefit from his rental property."). Consent or lose your livelihood—the choice presented to Plaintiffs—is not a genuine choice.

The Authority's remaining argument is that horseracing is a "closely regulated"

industry justifying warrantless inspection regimes. Authority Br. at 45-47. But even if horseracing is like the liquor, gun, or other industries with a long history of close regulation, that would not justify *HISA's* inspection scheme: namely, giving free-roaming authority to purportedly private individuals to ransack the files and records of other private individuals in their industry. The Authority points to *no other* inspection regime of this type; it is unprecedented. Put another way, the Authority's Fourth Amendment defense runs head long into its defense against the appointments and removal claims. Perhaps a *government* inspection regime would be appropriate in a closely regulated industry; but there is no precedent for saying a *private* inspection regime is. Perhaps this problem would not exist if the Authority were a government entity. But then, of course, the Authority and HISA would be in violation of Article II. The Authority cannot have it both ways.

Perhaps anticipating this argument, the Authority points out that FINRA's predecessor NASD had an inspection regime. *See Erenstein v. SEC*, 316 F. App'x 865, 869 (11th Cir. 2008). But as *Erenstein* explains, NASD's inspection rules were triggered *after a complaint had been filed* or an investigation otherwise opened. That regime almost certainly met basic requirements for probable cause. But moreover—to repeat the point one last time—the NASD was a truly voluntary, self-regulatory association. There is nothing voluntary or associational about the Authority. Thus, if it is private, it is once again a private entity wielding enormous power over other private persons—here, the search and seizure power. Giving private persons a blank check to search and seize without a warrant is contrary to the traditions of the American people and is patently unreasonable under the Fourth Amendment.

## V.    HISA's commandeering scheme is novel and unconstitutional.

Congress may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018); *Brackeen v. Haaland*, 994 F.3d 249, 298–99 (5th Cir. 2021). Congress must "exercise its legislative authority directly over individuals rather than over States." *New York v. United States*, 505 U.S. 144, 165, 188 (1992). Here, HISA violates the anti-commandeering doctrine because it deputizes state officers by requiring states (via their racing commissions) to remit state monies to fund the Authority's operations; if the states refuse, HISA prohibits the state from imposing or collecting taxes or fees to finance the state's *own* legislative programs related to horseracing.

True, the Sixth Circuit found this scheme to be constitutional:

> Congress may encourage the States through conditional preemption. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 290 (1981). Instead of preempting state law altogether, Congress may offer States a regulatory role contingent on following federal standards. *New York* [*v. United States*], 505 U.S. [144,] 167–68 [(1992)]. The choice brings consequences. If a State participates, it often has discretion in how it implements the program. *See Hodel*, 452 U.S. at 289. If a State decides not to participate, the State's activities are preempted. By offering States such a non-coercive choice—regulate or be preempted—Congress has not violated any constitutional imperatives. *Murphy*, 138 S. Ct. at 1479; *New York*, 505 U.S. at 167; *Hodel*, 452 U.S. at 288–91; *FERC v. Mississippi*, 456 U.S. 742, 769 (1982).

*Oklahoma v. United States*, 62 F.4th 221, 234 (6th Cir. 2023).

With all due respect to the Sixth Circuit, it missed the point. No one denies the validity of conditional preemption where Congress may otherwise regulate according to the Commerce Clause. Congress can offer the states the opportunity to legislate and administer *their own programs* in accordance with federal standards, or let the federal government step in. And, as noted in Plaintiffs' opening brief, Congress can use its

*spending power* to induce the states to take certain actions, as long as the states have a genuine choice. *See South Dakota v. Dole*, 483 U.S. 203 (1987); *NFIB v. Sebelius*, 567 U.S. 519, 580-81 (2012).

But Congress has done neither here. HISA is not an exercise in Congress's spending power. And HISA does not allow the states to operate their own horseracing programs (consistent with federal standards) lest the federal government step in. Instead, HISA forces the states to *administer* the *federal* program—collect our fees for us—on penalty of preemption. The Sixth Circuit missed the novelty of this arrangement; Plaintiffs know of no analogous situation. The question, they presume, is therefore whether the state has a genuine choice under this arrangement.

*Dole* and *Sebelius* hold that threatening to take away five percent of highway safety fundings is not coercive, but threatening to take away ten to twenty percent of a state's total budget is coercive. Where does threatening preemption—even if preemption, as in *Sebelius*, would be perfectly constitutional—fall? No court has addressed that question. Plaintiffs believe that threatening to disable the legislative power of the state lest they agree to *administer* the federal program (as opposed to running their own program that complies with federal standards) is not a minor inducement; it is a "gun to the head." *Sebelius*, 567 U.S. at 581.[12]

---

[12] The Authority—but not the FTC—argues that Plaintiffs lack standing to bring this claim because they are not a State. But Defendants represented to the Court in their opposition to Texas's intervention that "Texas's Interests Are Adequately Represented." DE 24 at 17. They should not now be rewarded for that representation. But even if that's wrong or irrelevant, Plaintiffs have their own independent standing. They are harmed by the commandeering scheme because Plaintiffs prefer Texas's "anti-doping and medication control" and "racetrack safety" rules, which the commandeering scheme will effectively disable Texas from implementing if it does not accede to the Authority's demand. This scheme hardly "helps" Plaintiffs by protecting

---

## CONCLUSION

HISA is riddled with constitutional infirmities. The Court should accordingly enjoin the law and the individuals purporting to exercise authority under it; grant Plaintiffs' motion for summary judgment; and award them any other or further relief, at law or in equity, to which they might be justly entitled.

---

them against duplicative taxation, Authority Br. at 18, because if Texas *does* help the Authority, then Texas still *can* collect parallel fees for its own programs. And if Texas does not help the Authority, then Texas is effectively disabled from implementing Plaintiffs' preferred rules. If that is not a concrete injury, it is not clear what would be.

Dated:  April 11, 2023

Respectfully submitted,

MAYNARD NEXSEN PC

By:_____

     Gregory P. Sapire
     State Bar No. 00791601
     gsapire@maynardnexsen.com
     Carlos R. Soltero
     State Bar No. 00791702
     csoltero@maynardnexsen.com

7320 N. MoPac Expy.
Suite 309
Austin, Texas 78731-2311
Telephone: (512) 431-9518
Facsimile: (512) 359-7996

TULLY BAILEY LLP

By: */s/ Ilan Wurman*_____
     Ilan Wurman
     Arizona State Bar No. 034974
     Texas State Bar No. 24090479[13]
     Ilan.wurman@asu.edu
     *Admitted Pro Hac Vice*

11811 N. Tatum Blvd.
Unit 3031
Phoenix, Arizona 85028
(480) 965-2245 Telephone

UNDERWOOD LAW FIRM, P.C.

By: */s/ Autumn L Flores*_____
     Autum L. Flores
     State Bar No. 24081205
     Autum.Flores@uwlaw.com

500 S. Taylor, Suite 1200
Amarillo, Texas 79101
Telephone: (806) 376-5613
Facsimile: (806) 376-0376

**ATTORNEYS FOR PLAINTIFFS
GULF COAST RACING LLC, LRP
GROUP LTD.; VALLE DE LOS
TESOROS LTD.; GLOBAL GAMING
LSP, LLC; AND TEXAS HORSEMEN'S
PARTNERSHIP LLP**

---

[13] Inactive

## <u>CERTIFICATE OF SERVICE</u>

I certify that that on April 11, 2023, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

/s/ Gregory P. Sapire
GREGORY P. SAPIRE
*Counsel for Plaintiffs*